## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

TINA ROOT,                                             CASE NO. 3:21 CV 1552

    Plaintiff,

    v.                                                JUDGE JAMES R. KNEPP II

DECORATIVE PAINT, INC.,
                                                       MEMORANDUM OPINION AND
    Defendant.                                     ORDER

### INTRODUCTION

Plaintiff Tina Root filed suit against her former employer, Defendant Decorative Paint, Inc., with allegations of disability discrimination and failure to accommodate under the Americans with Disabilities Act of 1990 as amended ("ADA"), 42 U.S.C. § 12101, et seq., and Ohio Revised Code § 4112.01, et seq., and allegations of retaliation in violation of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601, et seq.

Currently pending before this Court are the parties' competing motions for summary judgment. Both motions are fully briefed and ripe for decision.[1] For the reasons set forth below, Defendant's Motion (Doc. 19) is granted and Plaintiff's Motion (Doc. 18) is denied.

### BACKGROUND

Plaintiff Tina Root was employed by Defendant Decorative Paint, Inc., from September 2016 to July 2022. (Doc. 1, at 3-4). Plaintiff primarily worked in the "rework" department at the

---

1. Defendant also filed a Motion for Leave to File a Sur-Reply to Plaintiff's Motion for Partial Summary Judgment (Doc. 32); Plaintiff responded but did not oppose (Doc. 33).

company, but she was also assigned to other divisions. (Root Decl., at 1; Root Depo., at 48-55)[2].

She testified she typically spent approximately two hours each day in other areas of the facility,

including the A line. (Root Depo., at 55-56). Her job title was "production associate," and

according to the job description, her duties included "loads parts, unloads parts, production

tracking, labeling, moving of product onto appropriate racks, maintains production requirements

during shift and completes daily tasks as required by supervision." (Doc. 19-2, at 1). Required

physical demands/work environment included "exposure to general plant conditions." *Id.*

Defendant's facility subjects its workers to paint fumes to some degree; Richard D.

Roberts, a production manager at Defendant's facility, testified "the whole plant . . . [is] one big

paint fume." (Roberts Depo., at 65)[3]. While Plaintiff testified there are paint fumes throughout the

facility, she also characterized the rework department as having a more tolerable level of paint

fumes than other areas at the facility, such as the "D line" area. (Root Depo., at 107-08). Roberts

testified the fume smell in the "D line" and "A line" areas of the facility is "more pronounced"

than in other parts of the plant. (Roberts Depo., at 49-50). A report from air sampling expert

Barbara Sullins stated volatile organic compounds (or solvents) and/or isopropyl alcohol was

found in air samples from every area of Defendant's facility except the rework area. (Sullins

Report, Doc. 18-7, at 1).

Plaintiff avers she has chronic obstructive pulmonary disease ("COPD") and asthma, which

impact her ability to breathe and require her to use an albuterol inhaler as needed. (Root Decl., at

1). 2016 Notes from Plaintiff's treating physician, Dr. Kimberly Hagerman, included that Plaintiff

suffers from "chronic obstructive pulmonary disease, unspecified" and "moderate persistent

---

1. Root's Deposition is located at ECF Doc. 21; Root's Declaration is located at ECF Doc. 18-2.
3. Roberts' Deposition is located at ECF Doc. 24.

asthma, uncomplicated"; Dr. Hagerman's diagnoses for the visit included "chronic obstructive pulmonary disease, unspecified," and "cough". (Doc. 18-3, at 37-38). Dr. Hagerman began treating Plaintiff in 2016, and she testified Plaintiff's COPD and asthma diagnoses were preexisting, meaning Plaintiff either had diagnostic records from prior doctors or had told Dr. Hagerman about the diagnoses at her first appointment. (Hagerman Depo., at 32-33)[4]. Dr. Hagerman testified she never performed any testing of Plaintiff for COPD or asthma, but Plaintiff had those conditions and Dr. Hagerman had treated her for them. *Id.* at 93-96. Dr. Hagerman referred to Plaintiff's asthma as "not well controlled". *Id.* at 33.

In her Declaration, Plaintiff stated "working in the rework department allowed [her] to perform all the functions of [her] job without any need for accommodation related to [her] COPD and asthma." (Root Decl., at 2). In terms of other disability accommodations, Defendant made accommodations for Plaintiff to sit on a stool after a knee surgery. (Root Depo., at 65-67). Defendant also granted requests from Plaintiff that she be moved out of the D line whenever she was assigned there. *Id.* at 41 ("I was there maybe once or twice, but I couldn't stay there very long because it hurt to breathe . . . I told people, so they moved me out of the D line."), 75 ("Q: Whenever you asked to be moved from D line, did they grant that request? A: Yes.")).

On February 11, 2020, Plaintiff took FMLA leave for a knee replacement surgery. (Root Depo., at 93-94). While Plaintiff was on leave, Defendant laid off most of the company due to COVID shutdowns. (Fuller Depo., at 136)[5]. Defendant human resources employee Sara Fuller testified the company had received a doctor's notice confirming Plaintiff was medically cleared to return to work by May 9, 2020. *Id.* at 164-65. At this time, Defendant had begun calling laid off

---

4. Dr. Hagerman's Deposition is located at ECF Doc. 25.
5. Fuller's Deposition is located at ECF Doc. 23.

employees back to work. *Id.* at 168. Fuller testified some employees had returned to work in whatever areas needed assistance. *Id.* at 145-48 ("they were doing rework and finesse as needed, but primarily they were helping us everywhere else as well . . . [i]t would be what was required").

Plaintiff was not immediately reinstated when she was medically cleared to return to work. *Id.* at 165-66; *see also* Root Depo., at 118-20. Fuller called Plaintiff in July 2020 and asked her to return to work on July 21, 2020. (Fuller Depo., at 175; Root Depo., at 123). Plaintiff was assigned to the "D line" area on July 21 and worked a ten-hour shift there. (Root Depo., at 64; Fuller Depo., at 186). After her shift, Plaintiff scheduled a telehealth visit with Dr. Hagerman for that afternoon, where she complained of difficulty breathing due to paint fumes at work. (Root Depo., at 135; Hagerman Depo., at 50-51). Dr. Hagerman testified Plaintiff told her "she wanted to go back to her old department [in rework] so she didn't have that exposure [to paint fumes]." (Hagerman Depo., at 64). Dr. Hagerman authorized her staff to provide Plaintiff with a letter that read:

> This will certify that TINA ROOT has been under my care and seen in my office on 07/21/2020. Tina Root has an underlying condition—COPD & ASTHMA that makes it hard to breath [sic] when around paint fumes and should not be working around it.
> Please feel free to call our office with any questions or concerns.

(Doc. 18-3, at 23) *see also* Hagerman Depo., at 36, 74, 78-79.

Plaintiff gave the letter to supervisor Christopher Ankney at Defendant's facility the next day, July 22, and Ankney delivered the letter to Fuller in human resources. (Root Depo., at 136; Fuller Depo., at 187-88; Ankney Depo., at 98-99)[6]. Fuller testified she spoke with several members of Defendant's management staff, including production manager Roberts, after receiving the letter to discuss how to accommodate the requirement that Plaintiff not work around paint fumes. (Fuller Depo., at 189-95). Fuller testified the consensus of this meeting was that because

---

6. Ankney's Deposition is located at ECF Doc. 22.

of the presence of paint fumes in the facility at large, "it was probably going to be the best thing to have [Plaintiff] go home and not be around the paint fumes and discuss with her physician what we did and what, if anything, we can do to accommodate that." (Fuller Depo., at 195). Roberts did not recall such a meeting when he was deposed. (Roberts Depo., at 56-57).

Later that morning, Plaintiff met with Fuller and Roberts. (Root Depo., at 136; Fuller Depo., at 191). Plaintiff testified Fuller and Roberts told her she was a "liability" for Defendant and could not work there. (Root Depo., at 136-37). She recalled attempting to withdraw the letter from Dr. Hagerman and return to work, "because . . . I needed a job." *Id.* at 139. Plaintiff did not remember any discussion about being assigned permanently to rework, or any division other than the D line area. *Id.* at 139-40. Plaintiff did not remember who said it, but she did recall she was explicitly terminated from her job at that meeting. *Id.* at 143-44.

Roberts recalled thinking at the meeting with Fuller and Plaintiff that "there's nothing [the company] can do right now. Because . . . we are a paint company. We have fumes everywhere. . . . So I don't know how I could place someone somewhere with this being the criteria." (Roberts Depo., at 58). Roberts additionally remembered telling Plaintiff he could not forget the letter from Dr. Hagerman when Plaintiff tried to withdraw it. *Id.* at 59. He also recalled saying to Plaintiff that he felt he "would be responsible for a bad decision" if he assigned Plaintiff somewhere she would be negatively affected by paint fumes. *Id.* at 60. Roberts testified he left the meeting before Fuller and Plaintiff finished talking. *Id.* at 60.

Fuller's recollection of the meeting was that she asked Plaintiff about her condition and told Plaintiff she could not be on the production floor due to the paint fumes. (Fuller Depo., at 197). Fuller later testified she did not ask Plaintiff about her condition at the meeting. *Id.* at 209. Fuller testified Plaintiff repeatedly asked if Fuller was firing her, and that Fuller responded each

time by saying Plaintiff was not being fired but Plaintiff could not be at Defendant's facility if she could not breathe any paint fumes. *Id.* at 198-99. Fuller recalled saying, like Roberts, that she "can't unsee" the letter from Dr. Hagerman after Plaintiff tried to withdraw it. *Id.* Fuller testified that "at that point [Plaintiff] got up and left"; she also testified she told Plaintiff to go home that day. *Id.* at 206. Fuller characterized this as having "given my permission for [Plaintiff] to go ahead and go home until we figured out how we could accommodate her." *Id.*

Fuller testified Plaintiff never returned to work, but she had a phone conversation with Plaintiff within a few days of the July 22 meeting. *Id.* at 199-201. Fuller testified Plaintiff said Fuller terminated her; Fuller said she responded by telling Plaintiff she had not been terminated and needed to "go back to [her] doctor and see what we could do, or have them call [Defendant] so [Fuller] could let them know what we could do." *Id.* Plaintiff did not recall this conversation. (Root Depo., at 148).

Fuller testified Plaintiff's employment ended because "she never returned, nor did she provide documentation to indicate what kind of restrictions or accommodations she needed." (Fuller Depo., at 212). Defendant's work attendance records show Plaintiff left work on July 22, 2020, and incurred two unexcused absences on July 23 and July 24. (Doc. 19-17, at 28).

### STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains

sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). This burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* The nonmoving party must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. Further, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *See* Fed R. Civ. P. 56(c)(3) (noting the court "need consider only the cited materials").

**DISCUSSION**

Defendant has moved for summary judgment on all claims. (Doc. 19). Plaintiff has moved for partial summary judgment on her disability discrimination and failure to accommodate claims. (Doc. 18). This Court will first discuss Plaintiff's disability discrimination and failure to accommodate claims, and second, her FMLA retaliation claim.

Disability Discrimination and Failure to Accommodate

Plaintiff alleges in Counts II and III of her complaint that by terminating her employment, Defendant discriminated against her on the basis of her disabilities (COPD and asthma). (Doc. 1, at 7-8). Plaintiff alleges in Counts IV and V that Defendant failed to accommodate her disability in violation of state and federal law. *Id.* at 9-10. In her motion for summary judgment, Plaintiff argues judgment is appropriate in her favor on these claims. (Doc. 18-1, at 14, 19). In its competing motion, Defendant argues these claims by Plaintiff fail. (Doc. 19, at 12, 16). For the reasons stated below, the Court finds summary judgment in favor of Defendant is appropriate on all claims.

The ADA prohibits employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "Because Ohio's disability discrimination law parallels the Americans with Disabilities Act in all relevant respects . . . court[s] appl[y] the same analytical framework, using cases and regulations interpreting the ADA as guidance in [] interpretation of Ohio Rev. Code § 4112.02." *Belasco v. Warrensville Heights City Sch. Dist.*, 634 F. App'x 507, 514 (6th Cir. 2015) (internal citations omitted). Plaintiff's state and federal claims of disability discrimination and failure to accommodate therefore fail or succeed on the same merits.

Disability discrimination claims may be set forth by either direct or indirect evidence. *Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 297 (6th Cir. 2019). Under the direct test, Plaintiff must show (1) she was disabled, (2) she was "otherwise qualified" for the position, either with or without a reasonable accommodation, and (3) she suffered an adverse employment action because of her disability. *Morrissey*, 946 F.3d at 297. "Direct evidence of disability discrimination does not require the fact finder to draw any inferences to conclude that the disability was at least a motivating factor." *Id.*

When a plaintiff does not present direct evidence of discrimination, the claim is evaluated with the burden-shifting analysis laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011). Under this test, the plaintiff must establish a *prima facie* case of employment discrimination by showing (1) she is disabled, (2) she is otherwise qualified for the position, with or without accommodation, (3) she suffered an adverse employment decision, (4) the employer knew (or had reason to know) the plaintiff was disabled, and (5) the position stayed open while the defendant sought to replace her. *Ferrari v.*

8

*Ford Motor Co.*, 826 F.3d 885, 891-92 (6th Cir. 2016). If the plaintiff can show all five factors, the burden shifts to the defendant to articulate a non-discriminatory explanation for the employment action. *Gamble v. JP Morgan Chase & Co.*, 689 F. App'x 397, 401 (6th Cir. 2017). If the defendant does so, the burden shifts back to the plaintiff to show the defendant's explanation is pretextual. *Id.* The plaintiff need only prove "enough to create a genuine issue as to whether the rationale is pretextual." *Ferrari*, 826 F.3d at 895.

The ADA includes failure to make reasonable accommodations for a disabled but otherwise qualified employee in its definition of "discrimination," and the legal framework for failure to accommodate claims is a version of the framework for disability discrimination claims used above. *Kleiber v. Honda of America Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007). To prevail on a failure to accommodate claim, a plaintiff most show (1) she is disabled, (2) she is otherwise qualified for the position, and (3) the defendant refused to make a reasonable accommodation for her disability. *Fisher v. Nissan North America, Inc.*, 951 F.3d 409, 417 (6th Cir. 2020). "[C]laims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination." *Id.* at 416 (citing *Kleiber*, 485 F.3d at 868). The direct proof analysis, therefore, must be used for Plaintiff's failure to accommodate claim. *See Brumley v. UPS*, 909 F.3d 834, 839 (6th Cir. 2018); *EEOC v. Dolgencorp, LLC*, 899 F.3d 428, 435 (6th Cir. 2018).

For both her disability discrimination and failure to accommodate claims, Plaintiff must first show she is disabled and is otherwise qualified for the position (with or without an accommodation).

9

*Plaintiff's Disability*

Under the ADA, an individual is disabled if she "(1) has a physical or mental impairment that substantially limits one or more of the major life activities of such individual, (2) has a record of such impairment, or (3) is regarded by her employer as having such an impairment." *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008) (internal citations omitted); *see also* 42 U.S.C. § 12102(1). "Major life activities," as defined by the ADA, include but are not limited to the following:

> [M]ajor life activities include . . . caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.

> . . . [A] major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

42 U.S.C. § 12102(2).

Plaintiff cites Dr. Hagerman's statement that Plaintiff has COPD and asthma as proof of her impairment. (Doc. 18-1, at 22-23). Dr. Hagerman's treatment notes show she consistently treated Plaintiff for COPD and asthma, and Dr. Hagerman testified clearly that her medical opinion is that Plaintiff has the conditions. (Doc. 18-3, at 37-38; Hagerman Depo., at 93-96). Defendant argues that because Dr. Hagerman did not make Plaintiff's initial asthma and COPD diagnoses, Plaintiff has not shown she has a disability. (Doc. 19, at 17-18).

COPD and asthma are conditions which impact a person's lungs and airways and can make it difficult to breathe. These would correspond with the major life activities of breathing and respiratory function under the ADA. "An impairment need not prevent, or significantly or severely restrict a major life activity to be substantially limiting . . . the term 'substantially limits' shall be construed broadly in favor of expansive coverage and is not meant to be an exacting standard."

*Harrison v. Soave Enters. LLC*, 826 F. App'x 517, 523 (6th Cir. 2020) (internal citations omitted). However, diagnosis of an impairment alone is not sufficient to show disabled status; a plaintiff must show the impairment is substantially limiting compared to most people in the general population. *McNeill v. Wayne Cnty.*, 300 F. App'x 358, 361 (6th Cir. 2008); 29 C.F.R. § 1630.2(j)(1)(ii). Asthma and COPD are not necessarily substantially limiting conditions. *See, e.g.*, *Fischbach v. City of Toledo*, 798 F. Supp. 2d 888, 896 (N.D. Ohio 2011); *Svoboda v. TimkenSteel Corp.*, 2020 WL 1513710, at *7 (N.D. Ohio) ("While asthma . . . [is a] physical impairment[] that can affect an individual's major life activity of breathing, these illnesses present in varying levels of severity and [a plaintiff] must still prove that [his] condition . . . substantially limits his ability to breathe.").

In support of her claim that her COPD and asthma constitute a disability, Plaintiff testified she "can't walk as far" and sometimes feels as though she "can't breathe" because of her impairments. (Root Depo., at 25); *see also* Root Decl. at 1. Dr. Hagerman testified that Plaintiff's asthma is "not well controlled." (Hagerman Depo., at 33).

For purposes of comparison, in a case where a plaintiff was diagnosed with "a lumbosacral sprain and laryngeal irritation," was eventually "able to return to work with no limitation", and submitted an affidavit stating he "suffer[ed] from COPD as a result of exposure to chlorine gas fumes in the course of [his] employment", another judge of this court held the plaintiff had not provided sufficient evidence to "indicate[] that his COPD 'substantially limits' him in the major life activity of 'breathing'." *Fischbach*, 798 F. Supp. 2d at 896. The plaintiff in *Fischbach* provided nothing more than a diagnosis to support his claim.

The term 'substantially limits' is to be "construed broadly in favor of expansive coverage and is not meant to be a demanding standard." *Hostettler*, 895 F.3d at 854; *see also* 29 C.F.R. §

11

1630.2(j)(1)(i). "And for cases on the margin, the Act includes a 'rule of construction' that tips in favor of coverage. It instructs that the definition of disability 'shall be construed in favor of broad coverage of individuals . . . to the maximum extent permitted by the terms' of the ADA." *Darby v. Childvine, Inc.*, 964 F.3d 440, 445 (6th Cir. 2020) (quoting 42 U.S.C. § 12102(4)(A)). In the present case, Plaintiff has made a slightly better evidentiary showing than the plaintiff in *Fischbach*, as she was not considered by her doctor medically able to return to work without limitation. (Doc. 18-3, at 23). She also testified to her difficulty breathing. (Root Depo., at 25). There is enough evidence that this Court cannot hold as a matter of law that Plaintiff is not disabled. But nor can the Court hold as a matter of law that she is disabled. Plaintiff's testimony, Dr. Hagerman's testimony, and Dr. Hagerman's documents do not provide sufficient detail for this Court to determine whether Plaintiff's impairments are substantially limiting "compared to most people in the general population." *McNeill*, 300 F. App'x at 361. There is therefore an issue of material fact regarding whether Plaintiff is disabled, and the Court proceeds to the next prong of the disability discrimination analysis.

*Otherwise Qualified*

Assuming, *ad arguendo*, Plaintiff can show she was disabled, the disability discrimination inquiry moves onto whether Plaintiff can show was otherwise qualified for her position. An individual is "otherwise qualified" under the ADA if she can perform the "essential functions" of the job with or without reasonable accommodation. 42 U.S.C. § 12111(8). At issue here is whether tolerance of exposure to paint fumes was an essential function of Plaintiff's position. If it was an essential function of the role, requiring an accommodation involving zero exposure to paint fumes would leave Plaintiff unqualified for her job, as employers "are not required to create new jobs as an accommodation" and "removing an 'essential function' from the position . . . is *per se*

12

unreasonable*." Woodling v. GeoBuild, LLC*, 600 F. Supp. 3d 815, 826 (N.D. Ohio 2022), *aff'd*, 2023 WL 335283 (6th Cir.).

A job function may be essential because "the position exists . . . to perform that function", "because of the limited number of employees available" who can perform the function, or because "[t]he function may be highly specialized" and the person hired was hired for their expertise in that specialized function. 29 C.F.R. § 1630.2(n)(2). While the question of whether a job function is essential is "highly fact specific" (*Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 605 (6th Cir. 2018)), indicative factors include:

> (i) The employer's judgment as to which functions are essential;
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
> (iii) The amount of time spent on the job performing the function;
> (iv) The consequences of not requiring the incumbent to perform the function;
> (v) The terms of a collective bargaining agreement;
> (vi) The work experience of past incumbents in the job; and/or
> (vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3). Additionally, "[a] job function is essential if its removal would fundamentally alter the position." *Mosby-Meachem*, 883 F.3d at 603.

Plaintiff cites her performance of her job for nearly three and a half years as evidence she is qualified for her position. (Doc. 18-1, at 16). However, as she performed it – according to her – Plaintiff's job generally involved around two hours of work in non-rework areas of the plant (areas with paint fume exposure) each day. *See* Root Depo., at 55-56. This is 25 percent of a standard eight-hour workday; in other cases, duties on which an employee spends "ten to twenty percent" of their time have been considered "significant aspects of the position." *Thompson v. E.I. DuPont deNemours & Co.*, 70 F. App'x 332, 341 (6th Cir. 2003). And Plaintiff's job description includes "exposure to general plant conditions" under qualifications for physical demands/work environment. (Doc. 19-2, at 1). This job description also lists Plaintiff's role as "Production

Associate," and is explicitly not a rework-specific job. *Id.* Plaintiff testified this was an accurate description of her role, and that she understood general plant exposure was required by the job. (Root Depo., at 53). There is no evidence any job at Defendant's facility involved specific assignment to only one area such as rework.

All evidence surrounding the specific requirements of Plaintiff's job reflects exposure to paint fumes in the plant in general as an essential function of the role. While "the burden of making out a prima facie case is not an onerous one," factors such as the employer's judgment are less definitive "when an employee puts forth competing evidence". *Hostettler*, 895 F.3d at 854-55. Plaintiff has not put forth such evidence, and she has not carried her burden to show she was otherwise qualified for her role. That is, there is no genuine issue of material fact regarding whether exposure to paint fumes is an essential function of Plaintiff's job. And as the note from Plaintiff's physician stated Plaintiff could not work around paint fumes – could not perform this essential function of the job – termination of Plaintiff after providing that note was not disability discrimination. *Hostettler*, 895 F.3d at 854 ("an employee must show that she can perform the essential functions of a job").[7]

Because she has not shown she was otherwise qualified, Plaintiff fails to meet the second requirement of her disability discrimination and failure to accommodate claims, and it is unnecessary to analyze the remaining prongs. Defendant is entitled to summary judgment on these claims.

---

7. While this Court need not and does not reach later stages of the discrimination analysis regarding Plaintiff's proposed accommodation, it notes the only accommodation suggested by Plaintiff at any point of the litigation was a change in duties allowing Plaintiff to work only in the rework division. This would "fundamentally alter the position" by removing an essential function, and it is therefore *per se* unreasonable. *Mosby-Meachem*, 883 F.3d at 603; *Woodling v. GeoBuild, LLC*, 600 F. Supp. 3d at 826.

FMLA Retaliation

Plaintiff alleges in Count I of her Complaint that Defendant retaliated against her in violation of the FMLA. (Doc. 1, at 5). Defendant argues summary judgment in its favor is appropriate on this claim. (Doc. 19, at 9).  For the reasons below, the Court agrees with Defendant.

The FMLA prohibits employers from discriminating or retaliating against an employee for exercising rights granted by the statute. 29 U.S.C. § 2615. FMLA retaliation claims are analyzed under the same *McDonnell Douglas* burden-shifting analysis used in disability discrimination claims where there is indirect evidence. *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001). Plaintiff must make a *prima facie* showing of discrimination by showing "(1) she availed herself of a protected right under the FMLA by notifying [Defendant] or her intent to take leave, (2) she suffered an adverse employment action, and (3) that there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action." *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 508 (6th Cir. 2006) (citing *Skrjanc*, 272 F.3d at 314). If Plaintiff does so, "the burden shifts to the employer to proffer a legitimate, nondiscriminatory rationale for" the adverse action. *Id.* If Defendant does so, the burden shifts back to Plaintiff to show the reason presented by Defendant is "in reality a pretext to mask discrimination." *Skrjanc*, 272 F.3d at 315.

The parties agree that Plaintiff was granted and took FMLA leave in February 2020 for knee surgery. (Doc. 18-1, at 11; Doc. 19, at 8). The remaining factors are in dispute.

The plaintiff's burden to establish a materially adverse employment action "is less onerous in the retaliation context than in the anti-discrimination context." *Michael v. Caterpillar Fin. Serv. Corp.*, 496 F.3d 584, 595-96 (6th Cir. 2007) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006)). A materially adverse employment action in the retaliation context is

15

one that "might have dissuaded a reasonable worker" from engaging in a protected activity. *Redlin v. Grosse Pointe Public Sch. Sys.*, 921 F.3d 599, 616-17 (6th Cir. 2019) (citing *Burlington*, 548 U.S. at 68).

In her opposition brief, Plaintiff cites three events as "adverse employment actions": Defendant's failure to timely reinstate Plaintiff after her leave; Defendant's failure to reinstate Plaintiff to her former position (or an equivalent one); and Defendant's termination of Plaintiff. (Doc. 26, at 22-25).

*Untimely Reinstatement*

Plaintiff does not allege untimely reinstatement as a basis for her FMLA retaliation claim in her Complaint. *See* Doc. 1, at 6 ("74. Defendant retaliated against Root by forcing her to work in the small room full of paint fumes and very poor ventilation. 75. Defendant retaliated against Root by terminating her employment.").[8] Plaintiff sets forth her claim that her untimely reinstatement was an adverse employment action for the first time in her opposition to Defendant's motion for summary judgment. (Doc. 26, at 22).

A plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion. *Tucker v. Union of Needletrades, Indus. & Textile Emp.*, 407 F.3d 784, 788 (6th Cir. 2005). "To permit a plaintiff to do so otherwise would subject defendants to unfair surprise." *Id.* (citing *Guiffre v. Local Lodge No. 1124*, 1991 WL 135576, at *5 (6th Cir) ("[h]aving received no notice of [the new claims], the defendants had no opportunity to investigate them when they conducted their own discovery")); *EEOC v. J.H. Routh Packing Co.*, 246 F.3d 850, 854 (6th Cir. 2001) (even under the liberal notice-pleading regime, the Federal Rules of Civil

---

8. Earlier in her Complaint, Plaintiff contends only that she was not brought back sooner due to COVID. *See* Doc. 1, at 3 ("33. Sarah Fuller prevented Root from returning to work on May 10, 2020, due to COVID-19.").

Procedure still require "that the complaint give the defendant fair notice of the claim and its supporting facts")).  If Plaintiff wished to add this claim after discovery, she should have sought leave to amend her complaint via Rule 15(a). *Id.*; *see* Fed. R. Civ. P. 15(a).

Because Plaintiff did not properly plead a claim of FMLA retaliation based on untimely reinstatement, this claim is barred as a matter of law. *See, e.g.*, *Nathan v. Ohio State Univ.*, 984 F. Supp. 3d 789, 811 (S.D. Ohio 2013).

*Reinstatement to Identical or Equivalent Position*

Under the FMLA, employees who return to work within the twelve-week period of their unpaid medical leave are entitled return to "their previous position, or to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 506 (6th Cir. 2006) (citing 29 U.S.C. § 2614(a)). Plaintiff cites this provision in support of her FMLA retaliation claim to argue her assignment to the D line upon her return was retaliatory. However, "[o]nce the 12-week period ends, however, employees who remain unable to perform an essential function of the position because of a physical or mental condition . . . have no right to restoration to another position under the FMLA." *Id.*

Plaintiff's FMLA leave began February 11, 2020. (Root Depo., at 93-94). Plaintiff was medically cleared to return to work May 9, 2020. (Fuller Depo., at 164-65). This is a period of twelve weeks and four days. Plaintiff's leave exceeded the statutory period which requires reinstatement to an identical or equivalent position. 29 U.S.C. § 2614(a). Plaintiff was therefore not entitled to such reinstatement, and Defendant is entitled to summary judgment on this claim.

*Termination*

Plaintiff next alleges her termination was an adverse action by Defendant in retaliation for her use of FMLA leave. (Doc. 1, at 6). Defendant argues, first, that it called Plaintiff back to work

17

and did not terminate her, and second, that Plaintiff cannot show a causal connection between her use of FMLA leave and the end of her employment. (Doc. 19, at 14).

Even viewing the facts in the light most favorable to Plaintiff, her contention that her termination was retaliation for her use of FMLA leave makes little sense, as the parties agree that the end of Plaintiff's employment was motivated by issues surrounding Plaintiff's COPD and asthma, not her FMLA rights. Plaintiff characterizes her doctor's note requesting disability accommodation as the instigating factor in her termination (Doc. 1, at 5) ("54. After the accommodation request, Fuller and Roberts called Root into a meeting []. 55. During the July 22 Meeting, Roberts stated that Root was a liability and he could not have her in the factory. 56. During the July 22 Meeting, Defendant terminated Root's employment."), and she states in her opposition to Defendant's motion that "Dr. Hagerman's letter was specifically related to her request for accommodation, not her FMLA leave" (Doc. 26, at 21). Additionally, Plaintiff testifies that Defendant "made up their mind to let me go because I had COPD, asthma, and I was a liability to them." (Root Depo., at 146). The evidence available shows without reasonable dispute that neither party believed Plaintiff's FMLA leave was the impetus for her termination. Because Plaintiff has not shown a causal connection between exercise of her FMLA rights and the adverse employment action, Defendant is entitled to summary judgment.

Motion for Leave to File Sur-reply

Finally, Defendant has moved for leave to file a sur-reply to Plaintiff's reply in support of her motion for partial summary judgment. (Doc. 32). Defendant attached the proposed sur-reply to the motion. (Doc. 32-1).

This Court need not reach the argument addressed by the sur-reply– and did not in the above analysis – to decide the issues in this case. While typically this Court grants leave to file

18

sur-reply when it is necessary "to afford a party an opportunity to address new issues raised for the first time in the reply," *Eldridge v. Cardif Life Ins. Co.*, 266 F.R.D. 173, 175 (N.D. Ohio 2010), in this case, the Court denies Defendant's motion for leave to file sur-reply as moot.

CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that Plaintiff's Motion for Partial Summary Judgment (Doc. 18) be, and the same hereby is, DENIED; and it is

FURTHER ORDERED that Defendant's Motion for Summary Judgment (Doc. 19) be and the same hereby is, GRANTED; and it is

FURTHER ORDERED that Defendant's Motion for Leave to File Sur-reply (Doc. 32) be, and the same hereby is, DENIED AS MOOT.

 s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE